**CONSTELLATION NEW ENERGY, INC. Appellant**

v.

**The PUBLIC SERVICE COMMISSION OF the STATE of Delaware, Delaware Electric Cooperative, Old Dominion Electric Cooperative, Delmarva Power & Light Company, and The Public Advocate for the State of Delaware Appellees.**

Civ.A. No. 02A–07–007JOH.

Superior Court of Delaware, New Castle County.

Submitted: Dec. 18, 2002.
Argued: March 28, 2003.
Decided: April 25, 2003.

William D. Bailey, Jr., of the Bayard Firm, Wilmington, and Thomas W. Kinnane, of Kinnane & Associates, Annapolis, MD, for Constellation New Energy, Inc.

James McC. Geddes, of Ash by & Geddes, of Wilmington, for Public Service Commission of State of DE.

John T. Jaywork, of Hudson Jones Jaywork & Fisher, Wilmington and Eric M. Page, of LeClair Ryan, Glen Allen, VA, for Delaware Electric Cooperative and Old Dominion Electric.

G. Arthur Padmore, of Wilmington, for Public Advocate for the State of DE.

Gregory Inskip, Potter Anderson & Corroon, Wilmington and Randall V. Griffin, Wilmington, for Delmarva Power & Light Company.

## MEMORANDUM OPINION

HERLIHY, Judge.

■ Constellation New Energy, Inc.[1] challenges the Public Service Commission's approval of a comprehensive settlement addressing many issues with regard to Delaware's emerging competitive electric market, including the selection of rates, a standard offer service supplier, and congestion alleviation projects. Constellation maintains that the onus is on the settlement's proponents and on the Commission to demonstrate that each aspect of the settlement is supported by specific numeric analysis, and that since no such detailed evidence has been proffered, the settlement must be rejected as not being supported by "substantial evidence." This Court disagrees and affirms the Commission's order approving the settlement. This case involves judicial review for the first time of a statute authorizing settlements of disputes before the Commission. That statute authorizes the Commission to approve settlements, even ones contested by non-settling parties, where the Commission finds such resolution to be in the public interest. Upon review of the record, there is ample evidence supporting the Commission's finding that the settlement is in the public interest. Accordingly, the Commission's order approving the settlement is **AFFIRMED**.

### Facts

Prior to the enactment of the Electric Utility Restructuring Act of 1999,[2] Del-

---

1. On September 9, 2002, Constellation Energy Group acquired AES NewEnergy and the entity is now known as Constellation New Energy, Inc ("Constellation").

2. Title 26, chapter 10 of the Delaware Code.

marva Power & Light Co. was the exclusive provider of retail electric service to its service territories. That regulated retail service included the generation, supply and sale of electricity, as well as the transmission and distribution of that electricity to customers. The 1999 Act altered the system by deregulating the generation, supply and sale of electricity and implementing a system based on retail competition.[3] Now, customers of electric distribution companies, such as Delmarva, have the opportunity to choose their electric supplier in a competitive marketplace. However, the Commission continues to regulate the distribution of electricity by the local utility, including rates for that service.

In the case of Delmarva, the Act provided for implementation of competition over a three-year transition period ending September 30, 2002.[4] During the transition period, Delmarva continued to supply electricity to those customers not electing another supplier, pursuant to a rate established by the Commission.[5]

In addition, the Act provides for the selection of a "standard offer service supplier." A standard offer service supplier is defined as "an electric supplier that provides standard offer service to customers within an electric distribution company's service territory after the transition period."[6] "Standard offer service" is defined as "the provision of electric supply service after the transition period by a standard offer service supplier to customers who do not otherwise receive electric supply service from an electric supplier."[7] The

Commission is authorized to determine the standard offer service supplier based upon "various factors including but not limited to price, reliability and overall quality of the electric supply service offered."[8] In addition, the Commission is authorized to, in its discretion, establish a "bidding process" to determine the standard offer service supplier.[9]

Moreover, the Act authorizes the Commission to establish rules and charges with respect to customers who leave standard offer service and later return, including the "appropriate retail market price, which may be higher that the standard offer price."[10] The purpose for this provision is to allow the Commission to create a disincentive to seasonal switching. The concern is that a sophisticated customer could abuse the system by selecting a fixed rate during the high cost periods and then leave the fixed rate during low cost periods. This switching would result in a supplier serving a returning customer during high cost periods based upon rates developed from annual average costs.

On May 11, 2001, Delmarva Power & Light Company, Potomac Electric Power Company, Conectiv Communications, Inc. and New RC, Inc. filed an application with the Public Service Commission of Delaware seeking permission pursuant to 26 *Del. C.* §§ 215 and 1016 to transfer indirect control of Delmarva and Conectiv to New RC and Potomac. The Commission assigned the matter to a Hearing Examiner to conduct hearings on the application. The Commission set June 18, 2001, as the date for the initial pre-hearing and public

---

**3.** 26 *Del. C.* 1003(a).

**4.** 26 *Del. C.* 1004(a).

**5.** 26 *Del. C.* §§ 1006(a)(1)a. and 1010(a).

**6.** 26 *Del. C.* § 1001(16).

**7.** 26 *Del. C.* § 1001(15).

**8.** 26 *Del. C.* § 1010(a)(2).

**9.** *Id.*

**10.** 26 *Del. C.* § 1010(c).

conference and ordered newspaper publication of a notice.

A procedural schedule was approved on June 18, 2001. Public comment sessions were held on September 10, 12, and 18, 2001. Thereafter, the Public Advocate exercised its statutory right to intervene. In addition, several other interested parties sought and were granted leave to intervene in the proceedings. These parties include the International Brotherhood of Electrical Workers Local Union 1307, BOC Gases, Inc., Consumers Education & Protective Association of Delaware, Mr. Bernard J. August, Cable Telecommunications Association of MD, DE & DC, Old Dominion Electric Cooperative, the Delaware Electric Cooperative, the Delaware Energy Users Group and AES NewEnergy, Inc. (the appellant). Old Dominion Electric Cooperative and the Delaware Electric Cooperative will herein be referred to collectively as the "Cooperatives."

An evidentiary hearing was conducted on November 28, 2001, at which time the parties informed the Hearing Examiner that they were in the middle of informal settlement negotiations and near to reaching an agreement. There was an array of competing interests involved; these parties are certainly not traditional allies. Some parties, such as the cooperatives, apparently focused on relieving congestion, while others, like Delmarva and the Public Advocate, were more concerned about setting appropriate rates. Nevertheless, later that day, the parties reached an agreement. Constellation, the sole objector, noted its objections to the proposed settlement and was granted leave to file written testimony in opposition to it. Interestingly, several provisions of the settlement were included at the request of Constellation, the settlement's sole objector. A hearing to receive evidence and testimony was scheduled for December 18, 2001, and

public notice was published in the Delaware State News and the News Journal. The relevant portions of the notice stated:

On May 11, 2001, Delmarva Power & Light Company ("Delmarva"), Conectiv Communications, Inc. ("CCI"), Potomac Electric Power Company ("Pepco") and New RC, Inc. ("New RC") (together, "Applicants") filed an Application and testimony with the Delaware Public Service Commission ("Commission") seeking approval of a merger and related transactions (the "Merger") as described by Applicants. (1) Conectiv, the parent company of Delmarva and CCI, would merge with a subsidiary of New RC, with Conectiv as the surviving corporation; and (2) Pepco would merge with a different subsidiary of New RC, with Pepco as the surviving corporation; and (3), consequently, New RC would become the parent company of Pepco and Conectiv, with Conectiv continuing to own Delmarva and CCI.

\* \* \* \* \* \*

The proposed settlement executed by the Applicants and some of the other parties to the proceeding would approve the proposed merger subject to a number of conditions, including: 1) delivery and supply rate changes, 2) default supply service obligations, 3) commitments regarding corporate activities, 4) investments and contributions in Delaware, 5) transmission reliability and congestion issues, 6) merger costs, 7) service level guarantees, 8) certain competitive supplier issues, and 9) a removal of the Rate Q service classification from the tariff.

The settling parties filed the proposed settlement, supported by all parties except Constellation, on November 30, 2001. Some highlights from the proposed settlement include:

☐ Delmarva will remain the standard offer service ("SOS") supplier from May 1, 2003, through May 1, 2006, and the applicable rates for SOS's supply service will be representative of the regional wholesale electric market price plus a reasonable allowance for retail margin.

☐ For the period beginning on October 1, 2002, and ending on September 1, 2003, Delmarva will amend its tariff on returning customers such that an industrial or commercial customer returning to Delmarva's Standard offer service will pay either the Market Priced Supply Service ("MPSS") or a negotiated market price.

☐ For the period beginning on October 1, 2002, and ending on September 30, 2003, Delmarva will shift the Competitive Transition Charge ("CTC") rates for commercial and industrial customers [11] from the delivery component of rates to the supply (or unregulated) component.

☐ For the period beginning on October 1, 2002, and ending on September 30, 2003, Delmarva will shift the nuclear decommissioning costs for commercial and industrial customers [12] from the delivery component of rates to the supply component.

☐ For the period beginning on October 1, 2003, until May 1, 2006, Delmarva will increase the supply components of rates for commercial and industrial customers [13] by 103% of the prior rates, less the decommissioning costs.

☐ Effective October 1, 2003, until May 1, 2006, Delmarva will increase the delivery component of rates for residential and SGS–ND customers by 3%, and reduce rates to reflect the removal of decommissioning costs.

☐ Effective October 1, 2003 until May 1, 2006, rates will be frozen except that Delmarva will be permitted to seek: (i) recovery of extraordinary costs pursuant to 26 *Del. C.* § 1006; (ii) via a one-time recovery in the transmission component of rates, the cost of FERC-approved rate changes; (iii) a one-time recovery of changes in ancillary charges billed by PJM; (iv) to change certain optional services; (v) to change its rate design if such change is revenue neutral to Delmarva and among its customer classes; (vi) to change its rules and regulations; (vii) to change the credits for load management programs; and (viii) to change the MPSS rate to more accurately reflect market costs.

☐ Delmarva and BOC will terminate with prejudice the litigation in Docket No. 00–653 and enter into a special interim contract.

☐ Delmarva will agree with its two existing Rate Q customers on a process to move them to different contracts and to terminate Rate Q service on or about November 2, 2002.

☐ For the next 5 years, Delmarva's operational headquarters and significant senior management will remain in Delaware.

☐ For the next 6 years, Delmarva's charitable contributions will be maintained at levels comparable to its historic levels.

☐ Applicants will contribute $750,000 to Murex Investments so as to trigger

---

**11.** Excluding those receiving service under Service Classification SGS–ND.

**12.** Excluding those receiving service under Service Classification SGS–ND.

**13.** Excluding those receiving service under Service Classification SGS–ND.

matching state or federal funds, on the condition that the funds are spent on job training and small business development in Delmarva's Delaware service territory.

☐ Delmarva will not seek rate recovery of the merger transaction costs or the merger acquisition premium, including the break up fee if the merger does not occur.

☐ Delmarva will contribute $200,000 to an organization designated by Staff and DPA to promote renewable resources in Delaware and will assist in informing customers of such organization.

☐ Delmarva will participate in a working group to identify and develop cost-effective demand side management or conservation programs.

☐ Delmarva will implement a small pilot program for residential and small commercial consumers to test real-time metering or similar technologies.

☐ Delmarva will adopt the "appointments kept," "new residential customer installations," "bill accuracy" and "outage restorations" Service Level Guarantees with certain modifications, and the remaining proposed service level guarantees will be addressed in separate proceedings.

☐ Delmarva will modify its tariff provisions to benefit competitive electric suppliers with respect to the availability of electronic data.

☐ Delmarva will undertake to develop and implement within 9 months post-merger a "web-based mechanism" to transfer customers' historic interval data to competitive suppliers.

☐ Three transmission projects to be completed by May 2008 will be added and one currently scheduled transmission project will be accelerated.

☐ Delmarva will implement a methodology designed to reduce congestion on its transmission system using analysis of "off-cost operations" data available from PJM.

☐ Pursuant to 26 *Del. C.* § 1006(a)(2), Delmarva will file schedules demonstrating its overall return based upon cost of service data on or before March 30, 2002.

☐ On or before September 1, 2005, Delmarva will file a class cost of service study to permit a review and determination of the justness and reasonableness of its regulated rates on or after May 1, 2006.

☐ Each settling party may petition the Commission to reopen the record within 30 days of the filing of a Maryland settlement in Applicants' merger filing in that state.

During the December 18, 2001, public hearing, Constellation presented supplementary testimony in opposition to the settlement and the other parties presented testimony in support of it. A public comment session was conducted on December 20, 2001. In February, 2002, after the parties submitted briefing in support of their positions, the Hearing Examiner issued his report which recommended that the Commission approve the proposed settlement.

The Commission heard oral argument on March 19, 2002. On April 16, 2002, the Commission adopted the Examiner's findings and recommendation. Constellation filed a Petition for Rehearing and Reconsideration, which was denied on June 4, 2002. Thereafter, Constellation appealed the Commission's decision to this Court. Constellation makes several arguments on appeal.

First, Constellation maintains that the Commission's approval of increased standard offer service rates was arbitrary and

unsupported by substantial evidence. Title 26, section 1006(a)(1)a. of the Delaware Code provides that the retail market price for electric supply service for the transition period shall be "based upon and/or representative of regional wholesale electric market prices, plus a reasonable allowance for retail margin." Section 1006(a)(2)a. provides that at the end of the transition period, the retail market price under subparagraph (a)(1)a. shall become the standard offer service price. Constellation faults the Commission because it did not rely on any qualitative analysis as to market prices. Essentially, it maintains that the Commission did not identify any numerical evidence of the "regional wholesale market price" or "reasonable allowance for retail margin," thereby depriving this Court of the ability to determine that its decision was based on substantial evidence. Constellation also makes other tangential arguments. For instance, it argues that a fixed price for an extended period of time—approximately three years under the settlement—is contrary to the Electric Utility Restructuring Acts's purpose. Also, Constellation rejects the Commission's reasoning that 26 *Del. C.* 512, which directs the Commission to approve stipulations and settlements that it finds to be "in the public interest," eliminates the need for other considerations. According to Constellation, the Commission is relying on section 512 to avoid its statutory rate-making obligations and responsibility to implement retail competition in the state. In short, Constellation accuses the Commission of simply choosing to ignore the absence of evidence and lay blame upon Constellation for failing to supply its own, thereby improperly shifting the burden from the settling parties to the objecting party.

Second, Constellation contends that the Commission's extension of the standard offer service obligation of Delmarva is unsupported by substantial evidence. Pursuant to the settlement, Delmarva has been named to be the standard offer service supplier from the conclusion of the existing transition period, May 1, 2003, through May 1, 2006. Constellation maintains that there was no evidentiary basis for this decision and that it is arbitrary and capricious. By statute,[14] it argues, the Commission must consider the "price, reliability and overall quality of electric service"[15] of potential suppliers in determining the standard offer service supplier following the transition period. Since the Commission only considered these factors in a cursory manner, the argument continues, the Commission's decision is erroneous as a matter of law.

Third, Constellation maintains that the distribution rates and charges approved by the Commission are arbitrary and unsupported by substantial evidence and therefore erroneous as a matter of law. The settlement, in addition to establishing new standard offer service rates, provides for new adjusted distribution rates for Delmarva. The thrust of Constellation's complaint is that the Commission appears to have put significant emphasis on the fact that the rates were the product of "extensive negotiations", rather than undertaking an extensive statistical analysis. Constellation states, "Having been deprived of an evidentiary basis upon which to determine the appropriateness, justness and reasonableness of the rates, the settling parties are simply asking the Commission to accept the product of their self-interested negotiations."[16]

---

**14.** 26 *Del. C.* 1010(a)(2).

**15.** *Id.*

**16.** Appellant's Br. at 19.

Fourth, Constellation characterizes the Commission's decision regarding service congestion cost mitigation as being arbitrary and capricious, unduly preferential with regard to certain customers, and unsupported by substantial evidence. Under the approved settlement, Delmarva will complete certain transmission construction projects and will be required to undertake analyses of the economic impact of the congestion and the alleviation thereof by the construction projects. Constellation opposed these various mechanisms, arguing that while these proposals may assist Delmarva in reducing its own congestion related supply costs, the mechanisms do nothing to address congestion related costs that are incurred by competing energy suppliers. Constellation maintains that these measures do nothing to facilitate competition and are discriminatory, thus resulting in unjustly discriminatory rates in violation of 26 *Del. C.* §§ 303 and 311.

Fifth, Constellation argues that the notices for the underlying proceeding provided inadequate notice to interested parties of the Commission's intention to resolve issues unrelated to the proposed merger. It maintains that the limited efforts of the Commission to provide public notice to affected parties were deficient insofar as they failed to adequately describe the actual nature of the proceedings. Constellation likens the notices to "laundry lists" which contain information about the proceedings, but which bury the information among technical minutia. As a result, Constellation maintains, it was the one isolated opponent of the settlement.

Lastly, Constellation contends that the Commission based its decision on erroneous and misleading evidence that renders its orders erroneous as a matter of law. In advancing this argument, Constellation proffers comments made by the settle-ment's proponents in various proceedings in different states. These comments are of significant relevance, it suggests, because they are at odds with the positions taken before the Commission. In particular, Constellation argues that the parties have taken different positions before the different proceedings, positions that will produce different results not only for the development of the competitive market, but also the manner and role in which the applicants engage that market. In short, Constellation argues that the statements are so inconsistent that they raise the specter that parties have been disingenuous with the Commission, thereby calling into question the integrity of the Commission's decision.

### Standard of Review

Two statutes govern the scope and standard of this Court's review of the Commission's Orders. The scope of review is found in 26 *Del. C.* § 510, as follows:

(b) The appeal shall not be a trial de novo but shall be based upon the record before the Commission.

(c) The scope of review before the Court shall be that the Commission's findings shall be upheld if they are supported by sufficient evidence, free of error of law and not arbitrary or capricious. When factual issues are reviewed the Court shall take due account of the presumption of official regularity and quasi-legislative function and specialized competence of the Commission.[17]

29 *Del. C.* § 10142(d) sets forth the appropriate standard of review:

The Court's review, in the absence of actual fraud, shall be limited to a determination of whether the agency's deci-

---

**17.** 26 *Del. C.* § 510.

sion was supported by substantial evidence on the record before the agency.[18]

Furthermore, this Court sits as a "reviewing court, not as an administrative agency of superior rank." [19]

### *Discussion*

### I.

While Constellation alleges six grounds for appealing the Commission's order approving the settlement, much of its argument is premised on the implicit proposition that the Commission's approval of the settlement turned this case into a traditional rate case. Therefore, according to Constellation, substantial evidence in support of the Commission's approval of the adjustments to the supply and delivery components of the rates is required and the Applicants have the burden of proving the reasonableness of the rates.

Constellation relies heavily on *Application of Wilmington Suburban Water Corp.* [20] for the following proposition:

All utility rate cases are subject to an overriding public interest, since the Commission must regulate the rates chargeable by a legalized monopoly. The general public must ultimately sustain the burden of the rates. Thus, the Commission, as an administrative agency, represents the state and the public in all matters properly before it. It stands between the public and the utilities. Before a commission [sic] makes a finding upon an ultimate issue of fact, public policy requires that the public interest be protected either by a full hearing on all the evidence relating to that issue of fact or that the basis of the Commis-

sion's findings clearly appear in the record.[21]

From this backdrop, Constellation instructs, "In a matter such as this, this Court in its review process must clearly apply, in addition to those requirements of statute establishing the parameters of its review, the guidance of the *Wilmington Suburban Water* analysis." [22] In that case, the Supreme Court, among other things, reproached the Commission for its "unwise" decision to enter into a stipulation which could be construed or argued as a stipulation on an ultimate issue of fact.[23]

■ While the cases Constellation cites are certainly of significant historical importance, Constellation's reliance on them is misplaced because in the many years that have past since they were decided, the Delaware regulatory system has changed. Most importantly for the purposes of this discussion, 26 *Del. C.* § 512 was enacted. Prior to that enactment, the Commission did not have the authority to approve settlements or to permit the parties to stipulate to facts, so essentially every proceeding brought before the Commission was litigated to conclusion. The new statute, entitled "Settlements are to be encouraged", provides:

(a) Insofar as practicable, the Commission shall encourage the resolution of matters brought before it through the use of stipulations and settlements.

(b) The Commission's staff may be an active participant in the resolution of such matters.

(c) The Commission may upon hearing approve the resolution of matters

---

18. 29 *Del. C.* § 10142(d).

19. *Application of the Diamond State Tel. Co.,* 107 A.2d 786, 793 (Del.1954).

20. 203 A.2d 817 (Del.Super.Ct.1964).

21. *Id.* at 832–33.

22. Appellant's Br. at 8.

23. *Id.* at 832.

brought before it by stipulations or settlements whether or not such stipulations or settlements are agreed to or approved by all parties where the Commission finds such resolutions to be in the public interest.[24]

In other words, the legislature has determined that settlements are to be encouraged and that the Commission may approve any settlement it finds to be in the public interest, regardless of whether that settlement has been agreed to by all parties. It is important to note that no court has yet had the opportunity to apply this provision since its enactment in 1995; thus, this case deals with an issue of first impression.

■ Even with this new statute, the normal standards of appellate review, enunciated earlier, still apply. In other words, is there substantial evidence to support the Commission's approval of the settlement as being in the public interest and/or did it commit an error of law? The Court concurs with Constellation that section 512 does not change the applicable standard of review of Commission decisions, even those involving settlements. Nor does the statute change the obligation of the Commission to have substantial evidence supporting its public interest determination.

■ Generally speaking, there is ample substantial evidence from which the Commission could conclude the settlement to be in the public interest. First of all, as part of the settlement, Delmarva agreed to freeze its unregulated supply rates, over which the Commission has no authority, for another three years after the end of the transition period. The Commission heard testimony of Andrea Crane, the Public Advocate's expert witness, who testified that the rate certainty of the frozen rates is a benefit in and of itself, regardless of the level of the rates:

Q: (Hearing Examiner): In your oral testimony you indicated that you considered the rate certainty aspect of the proposed settlement to be a great benefit to consumers. Would this only apply if the proposed settlement rates are below market rates throughout the term of the proposed settlement's rates?

A: (Ms. Crane): No, I think rate certainty is a benefit regardless of the rate level. I mean, a customer may be willing today to lock in a certainty rate for a long-term period even if there's a possibility that rates will fall in the future. It's essentially like an insurance policy; you know what you'll be paying. And I think there is a benefit to that even if I may not get the very, very lowest rate possible during this four or five year period, at least I know what my costs are going to be, and I think there's a benefit to that.[25]

Additionally, several experts discussed how the settlement will increase the shopping credit for commercial and industrial consumers.[26] A shopping credit is the rate or price per electric unit used for comparing one energy supplier against another in a competitive retail environment. The rate generally reflects the price, expressed in kilo watt hours, to a customer for the supply portion of his or her bill. In order for an alternate energy provider to be competitive, wholesale electricity must be purchased and sold to retail customers at a price lower than the shopping credit. Therefore, increasing the shopping credit

24. 26 Del. C. § 512.

25. Tr. at 304–05.

26. Tr. at 230–31, 293–94, 308–09.

enhances the ability of alternate suppliers to compete for retail customers in Delaware. And the largest increases in the shopping credits are for the larger customer classes, those most likely to embrace alternate electric suppliers.

There is evidence of other benefits to Delaware that the Commission could rely upon in approving the settlement, but the Court need not belabor them here.[27] The Court also notes that it puts significant weight on the opinion of the Public Advocate, a party charged by statute[28] to protect the Delaware ratepayers, that the settlement is in Delaware's best interest.

■ However, Constellation is correct insofar as it maintains that the settlement cannot be in the public interest if it offends the very statute, the Electric Utility Restructuring Act, it purports to implement. Accordingly, the Court will address each of Constellation's specific arguments in turn.

## II.

■ Constellation's first argument is that the Commission's approval of increased standard offer service rates was arbitrary and unsupported by substantial evidence. Title 26, section 1006(a)(1)a. of the Delaware Code provides:

The retail market price for electric supply service (including losses to the customer's delivery point) shall be estimated and applied separately for each customer rate class for each year of the transition period. Such prices shall be based upon and/or representative of regional wholesale electric market prices, plus a reasonable allowance for retail margin to be determined by the Commission. Once established, such prices shall not thereafter be changed by the Commission during the transition period, except as the result of an appeal of the Commission's decision.[29]

In addition, section 1006(a)(2), labeled "Rates in effect after the transition period", provides in part:

a. At the end of the transition period set forth in § 1004(a) of this title, the retail market price under subparagraph (a)(1)a. of this section shall become the standard offer service price.

b. Such standard offer service price shall be the applicable retail market price for electric supply service for any customers who have not chosen an alternate electric supplier or have returned to obtaining their electric supply service from the standard offer service supplier, subject to such regulations as the Commission may adopt pursuant to § 1010(c) of this title for returning customers.

c. If DP & L is a standard offer service supplier, the standard offer service price

---

27. For instance, Delmarva has agreed to donate $750,000 for job training and business development, to donate $200,000 for the promotion of renewable resources in Delaware, to maintain its current levels of charitable donations for the next six years, and to maintain its operational headquarters in Delaware for the next five years.

28. The powers and duties of the Division of the Public Advocate are set forth in 29 *Del. C.* § 8808. Subsection (d) of that section provides in part:

The Public Advocate shall have the following powers and duties:

(1) To appear before the Public Service Commission on behalf of the interest of consumers in any matter or proceeding over which the Commission has jurisdiction and in which the Public Advocate deems the interest of consumers requires such participation.

(2) To advocate the lowest reasonable rates for consumers consistent with the maintenance of adequate utility service and consistent with an equitable distribution of rates among all classes of consumers.

29. 26 *Del. C.* § 1006(a)(1)a.

shall be revised by DP & L from time to time for each customer rate class to be representative of the regional wholesale electric market price, plus a reasonable allowance for retail margin to be determined by the Commission for providing such electric supply service. The standard offer service price may be reviewed from time to time by the Commission to determine whether it represents the regional wholesale electric market price, plus a reasonable allowance for retail margin.[30]

Constellation criticizes the Commission because it did not rely on any quantitative analysis as to market prices. Essentially, it maintains that the Commission did not identify any numerical evidence of the "regional wholesale market price," or "reasonable allowances for retail margin." Constellation concludes that since the Court cannot identify—and therefore cannot review—the components of the price determination formula setup under section 1006, the Court cannot find that the Commission's decision was based on substantial evidence.

Constellation's argument that the Commission lacked analytical data upon which to base its decision was echoed by its expert witness, Edward Toppi. While some of his testimony appeared to opine that the proposed rates were too low, Toppi clarified his position:

Q: Let me ask you a question based on the nature of your testimony, Mr. Toppi. Am I correct to understand in reviewing this testimony and primarily the rebuttal testimony marked as Exhibit 16 that AES's major complaint is that the proposed rates are too low?

A: No. That is not a correct statement.

Q: Other than the process by which the rates have been proposed in the settlement, what other major complaint does AES have with the establishment of the rates?

A: Other than the process by which they were arrived at?

Q: Correct.

A: None.

Q: None? I'm sorry. I didn't hear you.

A: That's correct. None.

Q: So the results from AES's perspective is satisfactory. It's the process that you have a problem with?

A: I can't make, you know, a statement about the results, because the—our belief is that the process to arrive at the results essentially did not take into account all the elements that it should have and, therefore, the results are—I don't know if they're good, bad, right on. It takes time to—I don't think the time and the process to which they were established was adequate to make that determination.[31]

However, several parties to the settlement and appellees point out that there is no single "wholesale price" that can be said to be "representative." This is because any such wholesale price is necessarily a composite of the prices of capacity, energy, and ancillary service, each of which will vary depending on whether one looks at today's prices, future price curves generated by models, or bid and ask prices in futures markets. Additionally, all of these factors are necessarily evaluated by each market participant through the lens of its perceptions of the risks assumed for variations in weather, customer usage, risks of lost or added customers, and other forces. Therefore, they conclude, any determination as to whether a particular

30. 26 *Del. C.* § 1006(a)(2).

31. Tr. at 186–87.

standard offer service price is representative of regional wholesale market price plus a reasonable allowance for retail margin necessarily entails judgements not easily reducible to a mathematical formula. That is why, the argument continues, it was necessary for the Commission to take the "end results" approach, relying on the experts' opinions that the settlement's rates were reasonable approximations.

Delmarva's expert, Joseph Wathen, testified that the standard offer service prices reflected in the settlement are representative of the wholesale market in that the rates are high enough to recover wholesale costs plus a margin.[32] His opinion was based on an evaluation using proprietary tools of Delmarva. Additionally, Commission Staff witness Janis Dillard testified that the proposed prices were representative of wholesale market prices plus a reasonable margin based upon an analysis of historic data. More specifically, Dillard testified:

A. Well, when we started into this settlement process I did try to do an analysis and it was based on historic data. It wasn't forward looking. But what I tried to look at were two things: I tried to look at the contracts that Delmarva had in place and I looked at the price of those, and then I also took a look what I'll call the incremental cost of power [as reported by the PJM Interconnection, LLC, or simply "PJM"]. And what I did was an analysis where I took an energy price that was based on the DP & L locational marginal price for a 13–month period for every hour of a 13–month, and I compared that to an hourly load profile. So I figured what the energy cost would be if a customer had to buy in PJM real-time market. I added in a component for typical mark-up for a supplier. I believe it's two to five mills. So this kind of marginal rate to me represented a ceiling of what the cost would be for this 13–month period, May 2000 through May 2001. And the results were that the ceiling represented by the locational marginal price and the I-cap rate were about 5.134 to 5.634 cents depending on your assumptions. And the bottom of the range I looked at which represented Delmarva's locked-in contracts represented a rate of 3.392 to 3.634. And the rates that are being proposed in the settlement fall within that range, so I felt comfortable that they weren't higher than market and I felt comfortable that they weren't so low that Delmarva was going to lose money.[33]

█. In addition, while Constellation's objection is not strictly evidentiary in nature, the Court nevertheless finds the Delaware Rules of Evidence instructive. Rule 703 provides that "[t]he facts or data . . . upon which an expert bases an opinion or inference . . . if of a type reasonably relied upon experts in the particular field in forming opinions or inferences upon the subject . . . need not be admissible in evidence." Therefore, the fact that the statistical evidence and propriety models that the experts relied upon in reaching their conclusions was not admitted into evidence, in no way affects the expert's ability to testify as to the reasonableness of the proposed rates. Furthermore, Rule 705(b) provides for objections by adverse parties on the ground that the expert does not have a sufficient basis for expressing an opinion, in which case a voir dire examination directed to the underlying facts or data is to be conducted. In this case, both Wathen and Dillard were subject to cross-examination and yet the Commission evi-

---

**32.** Tr. at 275–80.

**33.** Tr. at 311–12.

dently still found their testimony persuasive. Nor does it appear Constellation timely raised an objection.

■ Constellation, however, also makes two corollary arguments. First, it asserts that a fixed price for an extended period of time—approximately three years under the settlement—is contrary to the Electric Utility Restructuring Act's purpose. The Court is not persuaded. All rates are fixed, whether they are fixed for six months or six years. Therefore, Constellation's objection, as the Court interprets it, is that it would prefer to have the rates revised more frequently than as set out in the settlement. While the Court agrees with Constellation insofar as it asserts that the Electric Utility Restructuring Act envisions that rates be adjusted from time to time, in the Court's view, three years is not an inordinately lengthy period to have rates fixed. After the period, a new rate review would be conducted. Indeed, the Delaware General Assembly clearly believed that three years is not an inappropriately long period of time to freeze rates; the Electric Utility Restructuring Act, itself, mandated that rates be frozen for a period of three years.[34]

■ Second, Constellation maintains that the market priced supply service provision of the settlement would stifle competition and thwart development of the competitive market envisioned by the Electric Utility Restructuring Act.[35] The settlement, as approved by the Commission, modifies returning customer provisions in Delmarva's retail tariff. The larger, non-residential customers who obtain their supply from a competitive supplier and then return to Delmarva for supply service currently have a choice of pricing plans. They can choose to be served under a market priced supply service using a real-time fluctuating price published by an independent regional organization. This option allows them the freedom to switch to a competitive supplier on one month's notice. Alternatively, they can choose to be put on a fixed rate service, but in which case they would be unable to switch their supplier for twelve months. The settlement modifies the existing market priced supply service tariff and makes it mandatory. In other words, the twelve-month fixed rate option is eliminated. With regard to residential and smaller business customers, the settlement applies a twelve-month minimum stay requirement for returning customers.

The Commission, however, heard the testimony of the Public Advocate's witness, Andrea Crane, who opined that the settlement's mandatory market price supply service provision for large customers would actually promote competition.[36] These larger, more sophisticated entities, she reasoned, are well equipped to evaluate their options and the market priced supply service would only enhance their ability to pursue their best interests. Joseph Wathen testified similarly.[37]

The foregoing constitutes substantial evidence from which the Commission could

---

**34.** 26 *Del. C.* § 1006(a).

**35.** At oral argument, Constellation appeared to change its line of argument away from the "discrimination" tack to another, new argument. It appeared to challenge the market priced supply service provision because it does not include a "margin" as directed by statute. However, this Court declines to address the Constellation's new contention. The briefing deadline for this case was extended no less than four times, from the original date of September 25, 2002, to November 15, 2002. Constellation's new argument was simply submitted too late. The Court also finds that it otherwise lacks merit.

**36.** Tr. at 293–95.

**37.** Tr. at 239–42.

conclude that approval of the settlement with the proposed rates were in the public interest.

### III.

██ Constellation next argues that the Commission's extension of the standard offer service obligation of Delmarva is unsupported by substantial evidence. Pursuant to the settlement, Delmarva has been named to be the standard offer service supplier from the conclusion of the existing transition period, May 1, 2003, through May 1, 2006. Constellation maintains that there was no evidentiary basis for this decision and that it is arbitrary and capricious. By statute,[38] it argues, the Commission must consider the "price, reliability and overall quality of electric service"[39] of potential suppliers in determining the standard offer service supplier following the transition period. Since the Commission only considered these factors in a cursory manner, the argument continues, the Commission's decision is erroneous as a matter of law.

Title 26, section 1010(a)(2) of the Delaware Code provides:

> Prior to the end of the transition period set forth in § 1004(a) of this title, the Commission shall determine who the standard offer service supplier in DP & L's service territory will be following the transition period, based on various factors including but not limited to price, reliability and overall quality of the electric service offered. In determining the standard offer service supplier for DP & L's service territory, the Commission may use an auction bidding process. . . .

Nothing in the Commission's rules or regulations shall prohibit DP & L or its affiliates from participating in the bidding process for posttransition standard offer service. The Commission may also require DP & L to continue to be the standard offer service supplier or to supply a portion of the standard offer service after the transition period.[40]

██ The language of section 1010 clearly indicates that the Commission has discretion in choosing the post-transition period standard offer service provider. It *may* setup a bidding process or it *may* require Delmarva to continue to be the standard offer service supplier. The legislature's only true command is that the Commission base its decision on "price, reliability and overall quality of the electric supply service offered."[41]

In reality, a standard offer service provider must have the financial and institutional capabilities to obtain reliable sources of capacity and energy and the flexibility to meet the needs of customers. It is a demanding position. According to a Commission Staff evaluation, Constellation was unwilling to consider taking the position except at levels significantly higher than the settlement provides.[42] Additionally, true competition has yet to be achieved in Delaware. In her pre-filed testimony, Andrea C. Crane explained that the number of customers buying energy from alternate suppliers peaked at 202 and has fallen to eight, one of which is residential.[43] With respect to reliability and overall quality of service offered, it is very unlikely that there is any competitive supplier that would be interested in serving Delaware

---

**38.** 26 *Del. C.* 1010(a)(2).

**39.** *Id.*

**40.** 26 *Del. C.* § 1010(a)(2).

**41.** *Id.*

**42.** Tr. at 330.

**43.** *Pre-filed Direct Testimony of Andrea C. Crane* at 18.

and would exceed Delmarva's qualifications.

In short, in light of the discretion the Assembly has given the Commission, the relative lack of feasible alternatives, and the legislature's pronouncement that settlements are to be encouraged, this Court finds that the Commission did not err.

## IV.

■ Constellation's third argument is that the rates and charges approved by the Commission are arbitrary and unsupported by substantial evidence and therefore erroneous as a matter of law. The settlement, in addition to establishing new standard offer service rates, provides for new adjusted distribution rates for Delmarva. Constellation criticizes the Commission because it appears to have put significant emphasis on the fact that the rates were the product of "extensive negotiations," rather than undertaking an extensive statistical analysis. In particular, it asserts that the Commission's approval of the settlement "could easily place Delmarva ratepayers at future risk should it become necessary for Delmarva to make above market energy purchases to meet its load obligations resulting in the future, deferred collection of energy costs."[44] Constellation concludes, "Having been deprived of an evidentiary basis upon which to determine the appropriateness, justness and reasonableness of the rates, the settling parties are simply asking the Commission to accept the product of their self-interested negotiations."[45]

But the Commission found that the settlement was beneficial to ratepayers because its proposed increase in overall rates was generally below one percent, ranging from and increase of about 0.3% to an increase of about 1.4%, and that the levels would be frozen until May 2006.[46] It relied on the testimony of Joseph Wathen.[47] The Commission agreed with Wathen that in return for the modest rate change, the ratepayers will enjoy a price freeze, which will promote competition.[48] Several witnesses also testified that the rates are reasonable and that Delmarva should not lose money at the settlement's rates, notwithstanding fluctuating market prices.[49]

In essence, Constellation challenges the Commission's decision to believe appellees' witnesses rather than Constellation's witness. The Court is not equipped to upset that decision.

## V.

■ Constellation next characterizes the Commission's decision regarding service congestion cost mitigation as being arbitrary and capricious, unduly preferential with regard to certain customers, and unsupported by substantial evidence. Under the approved settlement, Delmarva will complete certain transmission construction projects and will be required to undertake analyses of the economic impact of the congestion and the alleviation thereof by the construction projects. Constellation opposed these various mechanisms, arguing that while these proposals may assist Delmarva in reducing its own congestion related supply costs, the mechanisms do nothing to address congestion related costs that are incurred by competing energy suppliers. Constellation main-

---

44. Appellant's Br. at 20.

45. Appellant's Br. at 19.

46. Commission Order No. 5941 at 31.

47. Tr. at 237.

48. Tr. at 234–36, 245–47.

49. Tr. at 275–80, 311–12.

tains that these measures do nothing to facilitate competition and are discriminatory, thus resulting in unjustly discriminatory rates in violation of 26 *Del. C.* §§ 303 and 311.

As Delmarva points out in its brief, there are two factors that affect the generation and transmission of electricity that are relevant to the congestion problem. First, there are physical limitations on the amount of electricity that can be moved from one region to another. Second, some power plants are cheaper to run than others due to fuel, location and other factors. Congestion occurs when demand is very high or when transmission or generation facilities become unavailable, for example, due to maintenance. While congestion problems could be virtually eliminated by enormously expanding the transmission system, the costs involved in such an undertaking would outweigh the possible benefits.[50]

The Commission contends that Constellation failed to raise its "discriminatory rates" argument before it and that therefore this Court need not address it. Putting that contention aside, the Court finds Constellation's claim to be without merit. Several witnesses, while admitting that the settlement's transmission congestion alleviation provisions would not eliminate all existing congestion problems, nonetheless testified that the transmission improvements required by the settlements would alleviate the congestion problem and therefore would benefit third-party suppliers and would be in the public interest.[51] In fact, John W. Rainey testified on behalf of the Cooperatives, which are very concerned with congestion problems, that the undertakings contained in the settlement will "go a long way in improving the transmission congestion problem on the Delmarva peninsula."[52] Thus, the Commission could rely on those experts' testimony in approving the settlement. Once again, an agency, as a finder of fact, may credit evidence upon which it relies to the detriment of conflicting evidence.

Furthermore, Constellation has provided no basis for its accusation that the provisions are somehow discriminatory. Instead, it merely bootstraps its argument by pointing out that there is no evidence on the record to refute its unsupported statement.

## VI.

Constellation next argues that the notices for the underlying proceeding provided inadequate notice to potential parties of the Commission's intention to resolve issues unrelated to the proposed merger. It maintains that the limited efforts of the Commission to provide public notice to affected parties were deficient insofar as they failed to adequately describe the actual nature of the proceedings. Constellation likens the notices to "laundry lists" which contain information about the proceedings, but which bury the information among technical minutia. As a result, Constellation maintains that it was the one isolated opponent of the settlement.

The Commission may decide the manner and method of giving notice to persons likely to be interested in the matter or proceeding.[53] By statute, it may order that notice be effected by various means,

---

**50.** Delmarva analogizes such an undertaking to building a twenty lane highway around Dover to alleviate traffic congestion during Nascar races at Dover Downs. Delmarva's Answer at 19.

**51.** Tr. at 286, 296–97, 309, 317, 334–38, 345–46.

**52.** Tr. at 335.

**53.** 26 *Del. C.* 102A.

including by publication in one or more publications of general circulation.[54] This was the method utilized by the Commission in this case. The relevant portions of the notice stated:

On May 11, 2001, Delmarva Power & Light Company ("Delmarva"), Conectiv Communications, Inc. ("CCI"), Potomac Electric Power Company ("Pepco") and New RC, Inc. ("New RC") (together, "Applicants") filed an Application and testimony with the Delaware Public Service Commission ("Commission") seeking approval of a merger and related transactions (the "Merger") as described by Applicants. (1) Conectiv, the parent company of Delmarva and CCI, would merge with a subsidiary of New RC, with Conectiv as the surviving corporation; and (2) Pepco would merge with a different subsidiary of New RC, with Pepco as the surviving corporation; and (3), consequently, New RC would become the parent company of Pepco and Conectiv, with Conectiv continuing to own Delmarva and CCI.

\* \* \* \* \* \*

The proposed settlement executed by the Applicants and some of the other parties to the proceeding would approve the proposed merger subject to a number of conditions, including: 1) delivery and supply rate changes, 2) default supply service obligations, 3) commitments regarding corporate activities, 4) investments and contributions in Delaware, 5) transmission reliability and · congestion issues, 6) merger costs, 7) service level guarantees, 8) certain competitive supplier issues, and 9) a removal of the Rate Q service classification from the tariff.

The entire notice was less than two pages long and clearly delineated the issues to be addressed. Constellation's "laundry list" argument is unpersuasive. Additionally, the parties likely to be interested in these issues are sophisticated entities, fully capable of realizing the importance of the proceedings from the notice.

▇▇ Also, Constellation's argument that the "breakneck" pace of the proceedings prevented other interested parties from getting involved is mooted by the fact that no other parties ever expressed a wish to become involved. If such a party had sought to participate, it could have simply requested additional time from the Hearing Examiner. But no party came forward.

The Commission did not err with regard to public notice.

## VII.

▇▇ Lastly, Constellation contends that the Commission based its decision on erroneous and misleading evidence that renders its orders erroneous as a matter of law. In advancing this argument, Constellation proffers comments made by the settlement's proponents in various proceedings in different states. These comments are of significant relevance, it suggests, because they are at odds with the positions taken before the Commission. Constellation maintains that the parties have taken different positions before the different proceedings, positions that will produce different results not only for the development of the competitive market, but also the manner and role in which the applicants engage that market. In brief, Constellation argues that the statements are so inconsistent that they raise the specter that parties have been disingenuous with the Commission, thereby calling into question the integrity of the Commission's decision.

Title 26, section 510(c) of the Delaware Code, however, clearly provides that an

54. *Id.*

appeal shall not be a trial de novo but shall be "based upon the record before the Commission." [55] Therefore, since the additional submissions provided by Constellation was not properly in the record before the Commission, this Court declines to consider them. Constellation's argument fails accordingly.

### Conclusion

For the reasons stated herein, the Public Service Commission's finding the settlement to be in the public interest and order approving the settlement was based on substantial evidence. Accordingly, the Commission's Order is **AFFIRMED**.

---

**55.** *See also In re Delaware Power & Light Co.,*    99 A.2d 270, 274 (Del.Super.Ct.1953).